UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10120-RGS |
| | ) | |
| LOREN HARTY | ) | |

### MOTION TO SUPPRESS IDENTIFICATION

Defendant, Loren Harty, moves to suppress any testimony by Mark McCalister, Damian Wiley, King Belin, Eric Gaines, Clemente Gonzalez, and Mariluz Cortes regarding the identification of the defendant as the person who possessed a firearm in Roxbury, Massachusetts on January 20, 2004.

In support of this motion, defendant states that this was a warrantless stop and seizure and that his initial detention violated the Fourth Amendment of the United States Constitution and all evidence flowing from the illegal stop and detention, including his subsequent identification, must be suppressed. As further grounds in support of this motion defendant states the procedures by which the witnesses identified him as the man who possessed a gun were unnecessarily suggestive and likely to have caused a misidentification, in violation of Neil v. Biggers, 409 U.S. 188 (1972), Stovall v. Denno, 388 U.S. 293 (1967), and Velez v. Schmer, 724 F.2d 249 (1984). Moreover, the suggestive show-up and photo array identification procedures have tainted any subsequent identifications by these witnesses. Defendant states

further that, under the totality of the circumstances, the identification is unreliable.  See Manson v. Brathwaite, 432 U.S. 98, 114-117 (1977).  The defendant further contends that the government cannot show an independent source for any future in-court identification.  See Gilbert v. California, 388 U.S. 263, 272 (1967).

Statement of Relevant Facts[1]

A.  The Encounter Between McAllister, Belin, Wiley and Assailant

In the late afternoon hours of January 20, 2004, Damian Wiley testified that he was walking home on Blue Hill Avenue when he met up with King Belin.  At that time, a man approached and asked them "What do you got?"  Wiley and Belin stated that they did not know the person and continued on there way home.  A verbal altercation ensued and the man followed Wiley and Belin to their home at 42 Julian Street in Roxbury, Massachusetts.  Wiley and Belin entered 42 Julian Street and proceeded to Mark McAllister's apartment on the second floor.  After Wiley and Belin entered the building, the perpetrator left the seen only to return approximately ten minutes later screaming and waving a gun.

---

[1] The relevant facts are gleaned from the Incident History transcription of the 911 call, attached as Addendum A; Mark McAllister's Federal Grand Jury testimony, attached as Addendum B; King Belin's Federal Grand Jury testimony attached as Addendum C; a photo-array of which there presently only exists a black and white photocopy, attached as Addendum D; and defendant's Boston Police Arrest Booking Form, attached as Addendum E.

At that time, Eric Gaines, who lived in a first floor apartment at 42 Julian Street, arrived home and began speaking with the man. Shortly thereafter, McAllister left his apartment and came downstairs in order to see if he could defuse the situation. After a brief conversation, the perpetrator pulled out a gun and fired a shot into the floor. While Gaines fled the scene, McAllister ran to the safety of his apartment. The man than proceeded to kick on McAllister's apartment door and demand that the occupants come outside. When they refused, the man left the building and the immediate area. The assailant was unknown to McAllister, Gaines, Wiley, and Belin.

B.  The Initial Description of the Assailant

At 4:03 p.m., Mariluz Cortes, a resident of 38 Julian Street, made a 911 call regarding a man with a gun. Cortes' description was a follows: a) Hispanic male; b) black jacket; c) black pants; d) black hat; e) 5' 3" tall; f) 32-33 years old; and g) gun in waistband. The 911 call provided no further description.

C.  The Identifications

1.  Show-up at 42 Julian Street

Boston police officers Jon-Michael S. Harber and Edward L. Gately, III responded to the 911 call. Officers Harber and Gately observed Mr. Harty standing on the corner of Blue Hill Avenue and Clifford Street. When stopped, Mr. Harty met only a

single characteristic of the description provided in the 911 call; to wit he was wearing a black coat.  In contrast, his appearance differed from that of the 911 call as follows: 1) he wore blue not black pants; 2) he had a full mustache and beard; no mention of facial hair on 911 call; 3) he is African-American not Hispanic; 4) He is 5' 8" not 5' 3"; and 5) he was not wearing a hat.  Notwithstanding these discrepancies, Officers Harber and Gately stopped Mr. Harty and searched him.  Mr. Harty did not have a gun in his possession.  Undeterred by the fact that Mr. Harty neither matched the description contained on the 911 tape nor possessed a gun, the Officers placed him in the back of a police car and transported him to 42 Julian Street.

Upon arriving at 42 Julian Street, Mr. Harty was removed from the police car, made to stand in the middle of the road, and was surrounded by uniformed police officers.  Meanwhile, inside 42 Julian Street, McAllister, Wiley, and Belin were told to look out a second floor window and further instructed "that's the guy?"[2]  McAllister and Wiley identified Mr. Harty as the man who had argued with them and possessed a gun.  Officers present at the scene maintain Belin also identified Mr. Hardy as the

---

[2] Mr. McAllister testified to this effect before the Federal Grand Jury. Addendum B, p.11.

assailant but Belin denies making an identification.[3] The identifications were conducted as a group, with all of the witnesses present in the same room, looking out the same window, and identifying Mr. Harty at the same time.

Simultaneous to the above identifications, Mariluz Cortes and her 12 year old son, Clemente Gonzalez, identified Mr. Harty as the perpetrator. Cortes and Gonzalez lived at 38 Julian Street and identified Mr. Harty from their apartment window. Again, at the time of the identification Mr. Harty was standing next to a police car, encircled by police officers, and appears to be the only person in civilian clothes. Again, Cortes and Gonzalez were in the same room when they identified Mr. Harty.

2.  Photo Array Identification

On March 8, 2004, one and one-half months after the date of the incident, Eric Gaines testified before a state grand jury. Prior to his testifying he was shown a photo array consisting of nine mug shots of nine men and he selected a photograph of Mr. Harty. There is no further information regarding the identification procedure contained in any of the discovery provided by the government beyond the simple assertion that Mr. Gaines selected a photograph of Mr. Harty. Defense counsel has

---

[3] Notwithstanding the fact that Belin denies identifying Mr. Harty, the instant motion seeks to suppress any testimony regarding any such identification by Belin and any in court identification of Mr. Harty by Belin.

only been provided with a one page black and white photocopy, which appears to depict nine photographs.

ARGUMENT

I.  THE IDENTIFICATION PROCEDURES WERE IMPERMISSIBLY SUGGESTIVE AND THE IDENTIFICATIONS ARE UNRELIABLE

A district court must conduct a two-step analysis to determine whether to exclude identification evidence. First, "the court must determine whether the procedure was impermissibly suggestive." United States v. De Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993). Second, "[i]f the court finds the procedure was impermissibly suggestive, it must then inquire whether, under the totality of the circumstances, the identification itself was reliable despite the suggestive procedure." Id. The court must be convinced that the totality of the circumstances of a particular case "give rise to a very substantial likelihood of irreparable misidentification" before it excludes identification evidence. Simmons v. United States, 390 U.S. 377, 384 (1968). The district court should grant the motion to suppress the show-up identifications of Mr. Harty by Mark McCalister, Damian Wiley, King Belin, Clemente Gonzalez, and Mariluz Cortes and the photo array identification by Eric Gaines because the identification procedures employed here were impermissibly suggestive and the identifications themselves were unreliable. Manson v. Brathwaite, 432 U.S. 98, 114-117 (1977); Neil v.

Biggers, 409 U.S. 188 (1972); Stovall v. Denno, 388 U.S. 293 (1967); United States v. Jesus-Rios, 990 F.2d 672 (1st Cir. 1993); Velez v. Schmer, 724 F.2d 249 (1st Cir. 1984).

In the present case, percipient witnesses McAllister and Wiley identified defendant as he stood in civilian clothes, in the middle of the road, next to a marked police vehicle, while encircled by police.  Moreover, McAllister and Wiley where standing side by side and looking out the same window when they made their respective identifications of the defendant.  Finally, this identification followed a police officer's instruction to look out the window by his saying "that's the guy?"  Simultaneous with the above identifications, Cortes and Gonzalez also identified the defendant while he stood in the street surrounded by police officers.

A staged one person show-up is presumptively suggestive. Jesus-Rios, 990 F.2d at 677; Schmer, 724 F.2d at 251.  Moreover, the unidentified police officer's statement to McAllister and Wiley prior to their identification unquestionably effected their ability to make an independent identification and has tainted any subsequent identification of the defendant by these witnesses (in court or otherwise).

Additionally, the suggestiveness of the show-up procedure coupled with the discrepancy between Cortes' description of the perpetrator on the 911 call and defendant's actual appearance

-7-

render her identification as well as that of her 12 year-old son, Clemente Gonzalez, unreliable.  Specifically, when Cortes made the 911 call, moments after the event and after only a brief moment to observe, she could only describe the perpetrator as a Hispanic man who was five feet three inches tall.  Likewise, she could only describe his clothing as black jacket, black pants, and a hat.  This description stands in stark contrast to Mr. Harty's appearance at the time the police seized him.  In fact, Mr. Harty met just one of the descriptive characteristics given by Cortes, i.e. black jacket.  Moreover, Mr. Harty had a full beard and mustache; a fact that Cortes failed to provide to the 911 operator.  Accordingly, the identification of Mr. Harty by Cortes and her son was not only impermissibly suggestive but also inherently unreliable.  Jesus-Rios, 990 F.2d at 677 (inaccuracy of prior description renders identification unreliable and inadmissible).

  Finally, the photo array identification of the defendant by Mr. Gaines also appears to have been unduly suggestive.  Based upon the discovery that has been provided in this case, which consists of a black and white photocopy of pictures, it is extremely difficult to ascertain the extent to which the photo array was inherently and unnecessarily suggestive.  It is not even clear whether the photographs viewed were all in color or black and white or whether there were some of each.

Similarly, it is impossible to tell whether the procedure was suggestive due to the color of clothing worn by the individuals depicted.  However, it is clear that of the nine individuals presented, only two appear to have a full beard and mustache.  The defendant is one of these two.  Of those two with a full beard and mustache, only the defendant has hair that is not closely cropped.

For these reasons, an evidentiary hearing is required to determine; (1) what basis if any justified the police seizing the defendant; (2) whether witnesses were allowed to be present while other witnesses identified the defendant; (3) the extent of police misconduct in coaching the witnesses to identify the defendant; (4) whether under the totality of the circumstances the show-up identifications are unreliable and the risk of misidentification so great as to require suppression; and (5) whether the photo array itself was unduly suggestive.

Because the procedures employed by the police in this case have forever altered the witnesses' abilities to make an independent identification untainted by the misconduct, any future identification is inherently unreliable and must therefore be suppressed.  See Wong Sun v. United States, 371 U.S. 471 (1963); Jesus-Rios, 990 F.2d at 677-679.

Defendant requests an evidentiary hearing on this motion and reserves his right to assert additional grounds for suppression based upon evidence at the hearing.

                                          LOREN HARTY
                                          By his attorney,

                                          /s/ Stylianus Sinnis
                                          Stylianus Sinnis
                                          B.B.O. #560148
                                          Federal Defender Office
                                          408 Atlantic Avenue, 3rd Floor
                                          Boston, MA  02110
                                          Tel: 617-223-8061