```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA    )
                            )
          V.                )    CR. NO. 04-10120-RGS
                            )
LOREN HARTY                 )
```

**CONSOLIDATED OPPOSITION TO DEFENDANT'S**
<u>**MOTION TO SUPPRESS**</u>

The United States opposes defendant Loren Harty's ("Harty") motions to suppress identification, statements and physical evidence.  In support of its opposition the government says the following.

### <u>Relevant Facts</u>

The relevant facts are described in detail in the Police Incident Report and the Complaint Affidavit, which are attached, respectively, as Exhibits 1 and 2.  As set forth in Exhibits 1 and 2, at approximately 4 p.m. on January 20, 2004, the Boston Police Department ("BPD") received two 911 calls reporting gunshots fired at 42 Julian Street in the Roxbury section of Boston.  Both callers gave their names and identified their locations.  One of those reports included a description of the shooter as a Hispanic male, approximately 30 years old, approximately 5'4", wearing a black jacket with a gun in his waistband.  One of the calls also reported that the shooter was walking on Blue Hill Avenue "toward the liquor store."  With this information, the Boston Police dispatcher radioed the information

to area cruisers.

Upon hearing the dispatch, BPD officers responded to 42 Julian Street, where the officers identified three prospective witnesses, Mark McCalister ("McCalister"), King Belin ("Belin"), and Damian Wiley ("Wiley").  The witnesses were interviewed at the scene.  Wiley explained to the officers that he was walking home from school on Blue Hill Avenue when he met Belin.  At that point a man, later identified as HARTY, came up to them and began to speak with them.  HARTY asked them "What do you got?"  Wiley and Belin said that they did not know the man and tried to get him to leave them alone.  HARTY said "You know me, I'm L".  HARTY then began to yell at them and attempted to start a fight.  He followed them to 42 Julian Street, but then walked away.  Approximately ten minutes later, the three young men heard HARTY screaming outside of 42 Julian Street.  HARTY was yelling "Come on out, I am going to pop you."  At this point, Wiley, Belin, and McCalister looked out of the apartment window and saw HARTY outside.  McCalister went outside to tell HARTY to leave.  HARTY said to him, "Tell them niggers to come out here, I am going to pop them."

As this was happening, the resident of Apartment 1 at 42 Julian Street, Eric Gaines, came home and was entering 42 Julian Street.  According to McCalister, HARTY pulled out a silver revolver and pulled back the hammer on the weapon.  McCalister

then ran up the stairs and into the house.  When he reached the apartment, he heard a loud bang that he believed was a gunshot. HARTY then ran up to the door of Apartment 2 and began kicking the door and yelling "I'm going to get you, motherfuckers". Officers at the scene observed two boot marks with snow on the front door to Apartment #2.

At the same time that officers were responding to 42 Julian Street, Boston Police Officers Jon-Michael Harber and Edward Gately, having heard the dispatch report that the shooter was walking on Blue Hill Avenue, towards the liquor store, responded to the area of Clifford and Blue Hill Avenue.  Officers Harber and Gately knew the area well and knew that there was a liquor store approximately one block from Julian Street at the corner of Clifford and Blue Hill Avenue.  As they neared the liquor store, the officers saw one person who appeared to match the description.  That man (later identified as Loren HARTY) was across the street from the liquor store standing in front of 170 Blue Hill Avenue.  The officers described HARTY as a Hispanic male, approximately 5'6", wearing a black jacket.  Officer Harber knew the male to be Loren HARTY ("HARTY").  Officer Harber also knew that HARTY had been arrested in the past for possession of a firearm as well as other felony offenses.

As the officers Harber and Gately approached HARTY, they noticed him to be extremely nervous.  They approached with

3

caution and Officer Harber pat frisked Harty. As HARTY was being pat frisked, he stated "I don't have nothing. I don't have no gun."

Officers Harber and Gately then spoke by radio with the officers at 42 Julian Street and it was decided to bring HARTY there for a show-up identification. The officers brought HARTY to 42 Julian Street. Upon arrival, Officer Harber entered 42 Julian Street and spoke to McCalister, Belin and Wiley. All three young men told the officers that they thought they could identify the assailant. HARTY was then taken out of the police car on the street below. According to officers at the scene, Wiley, Belin and McCalister looked at HARTY from the second floor window and identified him as the man involved in the incident. Belin, however, maintains that he never looked outside to identify HARTY. Wiley, Belin and McCalister all agree that Wiley and McCalister looked out and identified HARTY.

Further investigation at scene revealed what appeared to be a bullet hole in the floor of the first floor hallway and bullet fragments on the cellar floor in the area directly below the front hallway. That evidence was consistent with the suspect having pointed the gun downward and fired a shot directly into the floor. While investigating, Boston Police Detective Mitchell and Officer Gately were approached by a neighbor, Mariluz Cortez, who resided at 38 Julian Street. She reported that she had sent

4

her twelve-year-old son outside to retrieve something and he came running back inside and said that there was a man with a gun outside. Ms. Cortez said she went to the window and saw the man that the police officers now had in the police car (HARTY) waving a grey-colored handgun at the second floor window of 42 Julian Street and yelling for someone to come outside. Ms. Cortez said that HARTY then walked behind 4 Rand Place and then out to Blue Hill Avenue in the direction of the liquor store.

Boston Police Detective Frederick also spoke with Eric Gaines, the resident of Apartment 1. Mr. Gaines reported that he was returning home when he saw HARTY talking to Mark McCalister. Gaines then saw HARTY take a silver revolver from his waist. Gaines then ran into the house and closed the door.

Officer Gately followed the route that Ms. Cortez described the suspect as having traveled. (The route leads directly to the area of the liquor store where HARTY was found.) When Officer Gately followed the route, he found a single set of footprints in the snow leading toward Rand Place. Officer Gately later examined HARTY'S boots and found that the tread on his boots appeared to match the tread impression that he saw in the footprints in the snow. Officer Gately followed the footsteps to a field at the intersection of Julian Street and Rand Place. There, Officer Gately found a clearing in the snow. In that spot, Officer Gately found two rocks with a red brick bridging

the space between them.  The officer lifted the brick and saw a silver-colored revolver with a black handle.  Detective Tyrone Camper from the Boston Police Ballistics Unit arrived to recover the firearm, a Ruger .357 caliber revolver, bearing serial number 17063692, loaded with 4 live rounds of Remington Peters .357 caliber ammunition and one spent shell casing.  HARTY was subsequently arrested.  Upon his arrest, HARTY'S boots were seized as evidence.

On or about March 8, 2004, Eric Gaines identified HARTY from a photo array.  A copy of the photo array is attached as Exhibit D to the defendant's motion.

On or about March 19, 2004, HARTY was arrested on a federal complaint.  (Boston Police arrested HARTY on the related state charges on January 20, 2004, the day of the incident.)  Immediately upon executing the federal arrest warrant, ATF Special Agent Lisa Rudnicki read HARTY his Miranda rights.  ATF Special Agent Phillip Ball told HARTY: that he would not be asked any questions concerning his federal case because he had a lawyer in his state case; and that if he wanted to speak with them he should arrange it through his lawyer.  HARTY then immediately stated words to the effect of "that gun I just got off those kids I was fighting with."  Rudnicki and Ball told HARTY not to speak further without his lawyer present.  See Report of ATF Special Agent Lisa Rudnicki, attached as Exhibit 3.

**Argument**

A.  The Stop of Harty Was Lawful

Police Officers may temporarily detain an individual based on specific, articulable facts giving rise to reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1 (1968). The inquiry will center on "whether the officer's actions were justified at their inception and, if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau." United States v. Roman, 393 F.3d 63, 71 (1st Cir. 2004) citing United States v. Chhien, 266 F.3d 1, 6 (1st. Cir. 2001).

Here, the police officers reasonably relied on the information from the police dispatcher who, in turn, reasonably relied on the information from the two 911 calls. The 911 calls reflected contemporaneous, first-hand information concerning the suspect. Both callers gave their names and identified their location. The two calls corroborated each other. United States v. Anderson, 339 F.3d 720, 724 (8th Cir. 2003).

The police officers had both a detailed physical description of the shooter (Hispanic male, 5'4", wearing a black jacket) and a particularized, timely description of his starting location and direction of flight on foot (walking on Blue Hill Avenue toward the liquor store). Harty was found by the responding police officers within minutes of the shooting near the identified

liquor store. The officers immediately identified Harty as the only person resembling the description of the shooter. (Harty is a light-skinned black male. He is approximately 5'8" tall. He was wearing a black jacket.[1])

Harty, himself, also provided the officers with additional reason to suspect him. When they approached him, he acted extremely nervous. While being pat frisked he made a specific unprovoked reference to a gun, stating "I don't have nothing. I don't have no gun." In addition, one of the police officers knew that Harty had in fact previously possessed a gun, and been convicted of unlawfully possessing a firearm. These facts made it eminently reasonable for the police office to stop Harty.

B.   The Show-Up Identification Was Lawful

Show-ups that take place immediately after the offense has been committed may be necessary in order to avoid the mistaken apprehension of the wrong person. United States v. Watson, 76 F.3d 4, 6 (1st. Cir. 1996). When analyzing a show-up identification, a court must conduct a two-part inquiry. See United States v. Jesus-Rios, 990 F.2d 672, 677 (1st. Cir. 1993). First, "the court must determine whether the procedure used was

---

[1] That the 911 call described Harty as 5'4" is neither significant nor determinative. (It was plain from the description that the suspect was relatively short.) Any police officer knows that estimations of height are frequently imprecise and can be influenced by the relative locations of the observer and his subject. (Here, for example, the observer was looking down at the defendant from an upstairs window).

impermissibly suggestive," and, if so, "it must then inquire whether, under the totality of the circumstances, the identification itself was reliable, despite the suggestive procedure." Id.  The relevant factors in determining whether the totality of circumstances give rise to a reliable identification include: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the level of certainty demonstrated by the identifying witness; and 5) the amount of time between the crime and the identification.  Neil v. Biggers, 409 U.S. 188, 199-200 (1972); Jesus-Rios, 900 F.2d at 677.  It is only in "extraordinary cases that identification evidence should be withheld from the jury." Id. (quoting United States v. Maquire, 918 F.2d 254, 264 (1st. Cir. 1990).

Here, the show-up was not impermissibly suggestive.  Harty was briefly detained to determine if he was, in fact, the shooter.  When identified by the witnesses at the show-up, he was neither handcuffed nor restrained in any way by police officers.  See United States v. Hefferon, 314 F.3d 211, 218 (5th Cir. 2002) (show-up not impermissibly suggestive where suspect handcuffed behind his back, flanked by officers and young rape victim heard her parents discussing the imminent show-up before she identified the defendant.); United States v. Bennefield, 741 F.Supp. 1002 (D. Mass 1990)(show-up not impermissibly suggestive even though

9

defendant in handcuffs).

Even assuming, for the sake of argument, that the show-up was impermissibly suggestive, the identification was reliable given the totality of the circumstances. McAllister and Wiley walked with Harty for an entire block while he harassed them for drugs. The long period of time during which they observed him plus the confrontational nature their interaction (which would have made them alert to detail) bolsters the reliability of their identification. Mariluz Cotez made a completely <u>spontaneous</u>, <u>unsolicited</u> identification of Harty. She saw Harty from her window at the time of the crime and plainly had adequate time to observe him. Moreover, her observation of Harty occurred immediately after her twelve-year-old son told her he encountered Harty wielding a gun in the street. Any parent would be attentive after such an event. Similarly, Eric Gaines saw Harty take a silver gun from his waist in front of Gaines' residence. Gaines then ran right by Harty to go into his house.

All the witnesses were certain in their identifications. Moreover, all the identifications of Harty, except Gaines' occurred immediately after the crime. Those facts overwhelmingly establish that the identification of Harty was reliable under the totality of the circumstances. <u>Jesus-Rios</u>, 990 F.2d at 677; <u>Biggers</u>, 409 U.S. at 199-200.

C.    <u>The Seizure of the Boots Was Lawful</u>

Harty moves to suppress the seizure of his boots because their seizure derives from the initial police stop (of him), which he asserts was illegal.  Because the initial police stop was lawful (see above), his motion should be denied.

D.    <u>Harty's Statements Should Not Be Suppressed</u>

As described in her Complaint Affidavit, Harty's statements to ATF Special Agent Rudnicki were spontaneous, voluntary, not in response to <u>any</u> questions, and occurred after he had been given Miranda warnings and told he would not be asked any questions.  Moreover, Special Agent Rudnicki was investigating only the federal offense of a Possession of a Firearm and Ammunition by a Convicted Felon in violation of 18 U.S.C. §922(g)(1), for which Harty was not then represented by counsel.  Harty was then represented only for his state (Massachusetts) charges.  For the purposes of the Sixth Amendment, Harty's state charges constitute entirely separate offenses from his federal felon-in-possession charge.[2]  Consequently, Harty's statements to Special Agent Rudnicki should not be suppressed.

---

[2] Because Harty's claims are based only on his unsupported, self-serving affidavit, he must testify at any suppression hearing or his affidavit must be stricken (and his motion denied) <u>United States v. Baskin</u>, No. 03-1695 at pp. 4-5 (1st Cir. September 7, 2005).

## **Conclusion**

For the foregoing reasons, Harty's motions should be denied.

                    Respectfully submitted,

                    MICHAEL J. SULLIVAN
                    United States Attorney

By:
    /s/CHRISTOPHER F. BATOR
    Assistant U.S. Attorney

    Date: 1/6/06

CERTIFICATE OF SERVICE

    I, CHRISTOPHER F. BATOR, certify that a copy of the above has been served upon Stylianus Sinnis, Esq., Federal Defender Office, 408 Atlantic Avenue, Third Floor, Boston, MA 02110 by electronic filing.

                    /s/CHRISTOPHER F. BATOR
                    Assistant U.S. Attorney

                    Date: 1/6/06