UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10120-RGS |
| | ) | |
| LOREN HARTY | ) | |

DEFENDANT'S POST-HEARING BRIEF
IN SUPPORT OF HIS MOTION TO SUPPRESS

Defendant, Loren Harty, hereby submits this post-hearing brief for the Court's consideration in deciding his Motion to Suppress Physical evidence, Statements, and Identification evidence.

All facts in this brief are taken from testimony given at the suppression hearing and from exhibits entered into evidence at the hearing.

**STATEMENT OF FACTS**

On January 20, 2004, Boston police received a report of a man with a gun at 42 Julian Street in Roxbury. A 911 caller provided the following description of the alleged perpetrator: a) Hispanic male; b) black jacket; c) black jeans; d) 32-33 years old; e) 5'3" - 5'4" tall; f) wearing a black hat; g) carrying a gun in his waistband; and h) the caller did not describe the person as having facial hair. TR 1: 29 - 31 & 68 - 70.[1]  Police

---

[1] All references to the transcript will include the hearing day and page cite (TR: p.). For example a reference to day one of the hearing and page 30 would read as TR 1: 30.

dispatch relayed this information to Officers Harbor and Gately. The officers received no additional information prior to stopping Mr. Harty. TR 1: 30. Mr. Harty's appearance on January 20, 2004 stands in stark contrast to the description provided to Officers Harbor and Gately. Namely, when stopped by the officers Mr. Harty's appearance differed from that of the 911 call as follows: a) he is black not Hispanic; b) he wore blue work pants not black jeans; c) he stood 5'8" not 5'3"; d) he was not wearing a hat and did not have a hat in his possession; and e) he had a mustache and full beard. TR 1: 30 - 34. In fact, the only descriptive characteristic shared by Mr. Harty and that provided by the 911 caller was that Mr. Harty wore a black jacket. TR 1: 33.

Officers Harbor and Gately stopped and seized Mr. Harty, notwithstanding the fact that he met only one of the eight provided characteristics. TR 1: 34. Moreover, the Officers admitted that they stopped Mr. Harty because they knew him from prior cases. TR 1: 55. Specifically, and with apparent complete candor, Officer Gately testified that his partner, Officer Harbor, stated "that's Loren Harty. Stop him." TR 1: 55 - 56. The Officers then proceeded to frisk Mr. Harty and found that he was not in possession of a gun. TR 1: 35. Undeterred by the fact that Mr. Harty neither matched the description contained on the 911 tape nor possessed a gun, the Officers placed him in the back of a police car and transported him to 42 Julian Street. TR

1: 57 - 58.

Upon arriving at 42 Julian Street, the police removed Mr. Harty from the police car and made him stand in the middle of the road while flanked by Officers Gately and Clark. TR 1: 58 - 59. When Mr. Harty exited the police cruiser, Officer Harbor instructed 3 individuals, Mark McAllister, King Belin and Damon Wiley, all seated in the same room, to look out the second floor window of 42 Julian Street in an attempt to have them identify Mr. Harty as the alleged perpetrator. TR 1: 46 - 48. The identifications were conducted as a group, with all of the witnesses present in the same room, looking out the same window, and identifying Mr. Harty at the same time. TR 1: 46-48. Notably, Officer Harbor's testimony on this point was directly contrary to his testimony before a grand jury investigating Mr. Harty on related state court charges. TR 1: 47 - 48. Two of the witnesses identified Mr. Harty as the man who confronted them in the vestibule at 42 Julian Street while the third denied making an identification. Simultaneous to the above identifications, Mariluz Cortes and her 12 year old son, Clemente Gonzalez, identified Mr. Harty as the alleged perpetrator. TR 1: 65. The police arrested Mr. Harty and seized his boots. TR 1: 67.

On March 19, 2004, federal agents from the Bureau of Alcohol, Tobacco, and Firearms arrested Mr. Harty. TR 2: 25. Following his arrest on the instant federal charges, Special

Agent Lisa Rudnicki read Mr. Harty is Miranda rights.  TR 2: 26.
Agent Rudnicki testified that Mr. Harty was visibly upset and
shaken.  Id.  At no time did Mr. Harty either verbally or in
writing waive his Miranda rights.  TR 2: 40.  After reading Mr.
Harty his Miranda rights, Agent Rudnicki expressly asked Mr.
Harty if he had any information regarding where the gun came
from.  TR 2: 34.  Mr. Harty, in direct response to Agent
Rudnicki's question, stated that he "took that gun off those kids
I was in a fight with."  TR 2: 35.

> 1.    The Warrantless Street Stop and Seizure of Mr. Harty
>        was Not Supported by Reasonable Suspicion.

On January 20, 2004, Boston police observed Loren Harty, a
man known to them from prior encounters.  Mr. Harty met only one
of eight descriptive characteristics imparted to the officers
from police dispatch and which originated from a 911 call.
Namely, he wore a black jacket.  This can hardly be viewed as
distinctive or corroborating evidence justifying the stop,
seizure, frisk, and transportation of Mr. Harty to the scene of
the alleged crime.  Moreover, Officer Gately candidly testified
that the true reason he and his partner stopped Mr. Harty was for
the simple fact that he was Loren Harty.  Specifically, Officer
Gately testified that his partner, Officer Harbor, stated "that's
Loren Harty.  Stop him."  TR 1: 55 - 56.  It is against this
backdrop that the court must analyze the validity of the officers
actions in initially seizing Mr. Harty and their continued

detention and transportation of Mr. Harty back to 42 Julian Street.  Terry v. Ohio, 392 U.S. 1 (1968).

A Terry stop requires specific articulable facts supporting a police officer's reasonable suspicion "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous."  Terry, 392 U.S. at 30.  The Terry court set forth a two-prong inquiry, asking first "whether the officer's action was justified at its inception," and, second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.

Here, it is unremarkable that a male wearing a black jacket might be walking down Blue Hill Avenue at 4:00 p.m.  In fact the officers testified that there were many people out on the street and that Mr. Harty was not the only black male.  TR 1: 30, 34. Other than the fact that Mr. Harty wore a black jacket and was male, he met absolutely none of the descriptive characteristics provided to the police from the 911 caller.  Moreover, the officers make no attempt to conceal the fact that they stopped Mr. Harty not because he met the description provided to them by dispatch but rather because they knew him from prior encounters. TR 1: 55 - 56.  The simple fact that Officer Harbor had arrested Mr. Harty in 1999, 5 years before the current incident, in no way justifies the police actions on January 20, 2004.

The initial stop and seizure of Mr. Harty was not legally permissible. During the course of the evidentiary hearing in this case the police failed to identify articulable facts, warranting a seizure of Mr. Harty. He neither met the description of the alleged perpetrator nor was he otherwise acting suspiciously at the time the police stopped him on Blue Hill Avenue. Simply put, the officers had no reasonable suspicion even for a Terry stop. Terry, 392 U.S. at 28-31; United States v. Monteiro, 447 F. 3d 39 (1st Cir. 2006)(defendant's reputation as gang member insufficient to justify Terry stop absent additional articulable facts demonstrating involvement in recently completed or ongoing criminal activity); Contra, United States v. Romain, 393 F. 3d 62 (1st Cir. 2004)(Defendant's actions - flying into a rage, running at officer, and belligerence - provided reasonable suspicion to justify Terry stop).

Moreover, when a police frisk of Mr. Harty failed to turn up a gun (the alleged crime being investigated), thereby dispelling any reasonable belief concerning Mr. Harty's involvement, the police should have allowed Mr. Harty to go on his way. Rather, the police ordered Mr. Harty into a police car and drove him to 42 Julian Street. This action transformed the initial detention of Mr. Harty into a de facto arrest. United States v. Acosta-Colon, 157 F. 3d 9 (1st Cir. 1998)(fact based inquiry into

totality of circumstances necessary to determine if Terry stop tantamount to an arrest). Here, the police transported Mr. Harty, against his will, from one location to another thereby heightening the coercive nature of the detention. This action transformed what had been an invalid Terry stop into an invalid de facto arrest of Mr. Harty. Accordingly, the stop and subsequent detention of Mr. Harty was unwarranted and its fruits including the subsequent identifications of Mr. Harty and the seizure of his shoes must be suppressed. Wong Son v. United States, 371 U.S. 471 (1963).

    2.   The Identification Procedures Were Impermissibly Suggestive and the Identifications are Unreliable.

A district court must conduct a two-step analysis to determine whether to exclude identification evidence. First, "the court must determine whether the procedure was impermissibly suggestive." United States v. De Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993). Second, "[i]f the court finds the procedure was impermissibly suggestive, it must then inquire whether, under the totality of the circumstances, the identification itself was reliable despite the suggestive procedure." Id. The court must be convinced that the totality of the circumstances of a particular case "give rise to a very substantial likelihood of irreparable misidentification" before it excludes identification evidence. Simmons v. United States, 390 U.S. 377, 384 (1968).

A.    Impermissibly Suggestive Procedure

A show-up identification is considered more suggestive than a lineup identification. Velez v. Schmer, 724 F. 2d 249, 251 (1st Cir. 1984). Although "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," Stovall v. Denno, 388 U.S. 293, 302 (1967), courts have recognized legitimate exceptions based upon necessity. See e.g., United States v. Watson, 76 F. 3d 4, 6 (1st Cir. 1996)(avoiding apprehension of wrong person); Johnson v. Dugger, 817 F. 2d 726, 729 (11th Cir. 1987)(allowing immediate confrontations before suspect changes appearance, while witness's memory still fresh, and for quick release of innocent people). Otherwise, lineups are generally required. Velez, 724 F. 2d at 251.

Here, the show-up procedure was impermissibly suggestive because the police officers flanked Mr. Harty at the time of the identifications, and Mr. Harty was jointly viewed by the three witnesses. Specifically, Officer Harbor testified that all the identifying witnesses (Mark McAllister, Damon Wiley, and King Belin) were physically present in the same room at the time that each identified Mr. Harty. TR 1: 46-48. Thereby affording each identifying witness the opportunity to be influenced by another witness. United States v. Bagley, 772 F.2d 482, 494 (9th Cir. 1985)(joint confrontation of an alleged perpetrator is a

-8-

disapproved identification procedure); United States v. Strode, 229 F. 3d 1161 (9th Cir. 2000)(Unpublished Opinion)(Group show up identification procedure unduly suggestive).

If a show-up identification is necessary to avoid apprehension of the wrong person, then the police should follow a procedure that considers the actual circumstances surrounding a particular identification to assure they have the right person. Specifically, the police should separate the identifying witnesses and ensure that there is no opportunity for the witnesses to influence each other in their decision making process. This is especially the case when, as here, the identifying witnesses are either related to each other or friends thereby increasing the likelihood that one or more of the witnesses would feel pressure to confirm the identification of another witness.

Therefore, McAllister, Belin, and Wiley's show-up identification should be excluded because the circumstances prove that it was impermissibly suggestive.

    B.   The Witnesses Identification Should be Suppressed Because it was Unreliable.[2]

Because the show-up technique was improper, a court must determine if the identification itself was reliable under the

---

[2] Identifications by Cortes and Gonzalez are also unreliable because Cortes was in fact the 911 caller and as discussed above her description of the alleged perpetrator bears little to no resemblance to Mr. Harty on January 20, 2004.

totality of the circumstances, despite the suggestive procedure.

Jesus-Rios, 990 F.2d at 677.  "Reliability is the linchpin in

determining the admissibility of identification testimony."

Mason v. Brathwaite, 432 U.S. 98, 114 (1977).  Reliability is

determined by considering five separate factors.  They are:

> "[1] the opportunity of the witness to view the criminal at
> the time of the crime, [2] the witness' degree of attention,
> [3] the accuracy of his prior description of the criminal,
> [4] the level of certainty demonstrated at the
> confrontation, and [5] the time between the crime and the
> confrontation."

Neil v. Biggers, 409 U.S. 188, 199-200 (1972); Jesus-Rios, 990

f.2d at 677.  Considering each of the factors in turn as they

apply to the identification by McAllister:[3]

1.    *Witnesses Opportunity to View the Alleged Perpetrator*.

McAllister had an extremely brief and limited opportunity to

observe the man with whom he allegedly struggled.  McAllister

testified that he had a brief struggle with a person previously

---

[3] As to Damon Wiley, the Government failed to call him at the
evidentiary hearing and provided no evidence on any of the listed
factors.  Accordingly, if the Court finds the show-up procedure
employed in this case to be impermissibly suggestive, Wiley's
identification of Mr. Harty must be suppressed because the Government
has failed to meet its burden in showing that the identification was
otherwise reliable and it must be precluded.

As to King Belin, Mr. Belin, after being called to testify by the
defense, asserted his Fifth Amendment right against self-incrimination
and refused to answer any questions regarding his knowledge of the
incident.  Moreover, Mr. Belin previously denied making any
identification of Mr. Harty.  See King Belin's federal grand jury
testimony, pages 10-11 attached as Exhibit C to defendant's motion to
suppress identification.  Accordingly, the Government has again failed
to meet its burden in showing that Mr. Belin's identification was
otherwise reliable and it must be precluded.

unknown to him in the vestibule area of his building. He testified that the person had seven or eight shoulder length braids. TR 1: 106. He further testified that the person had a white shirt. TR:1 107. When the police arrested Mr. Harty shortly after the alleged altercation he did not have braids and he wore a blue shirt under a black leather jacket.

    2.   *Degree of Attention*. It is fair to say that McAllister's attention was not particularly acute, given the facts and surrounding circumstances of his observations on January 20, 2004. Specifically, he was struggling with an armed individual and it is reasonable to assume that his attention was focused on the weapon and not the assailant.

    3.   *Accuracy of Prior Description*. McAllister described the man with the firearm as having seven or eight shoulder length braids, a mustache, white shirt, and black jeans. TR 1: 106 - 107. The police report and booking photograph show that Mr. Harty wore blue work pants, had on a blue shirt, black leather coat, had a full beard, and no shoulder length braids. In fact, Mr. Harty's hair was cut rather short. See Velez, 724 F.2d at 252 (identification not accurate where witnesses did not give assailant's age, build, height, weight, skin color, clothing, or other indicia of appearance). Given these manifest inaccuracies in McAllister's description of his assailant, his testimony fails to rise to the degree required for an identification to be

considered reliable.

    4.   *Certainty of Witness*. The degree of certainty is the key in determining the reliability of an identification. <u>United States v. Simoy</u>, 998 F. 2d 751, 752-53 (9th Cir. 1993). Here, there is virtually no evidence in the record to demonstrate the degree of McAllister's certainty. Similarly, he never suggested indirectly how certain he was of the accuracy of his identification. On the contrary, McAllister's testimony was focused more on factors suggesting that he was not at all certain: namely, mistaken as to length and style of hair, mistaken on color of shirt and pants, and failure to indicate that his assailant had a full beard.

    Given the minimal degree of certainty evident here, it cannot be said that the show-up identification of a man surrounded by police, from a second floor window, in the presence of other identifying witnesses is reliable. Finally, there is no other information to evaluate McAllister's degree of certainty because the police neglected to present him with a photo array or arrange a lineup to confirm the reliability and accuracy of the identification.

    5.   *Length of Time*. The record is devoid of evidence on how long the encounter in the vestibule took. However, it appears that it was abbreviated.

    Given the consideration of the aforementioned lack of

indicia of reliability, it can be said that there was a

substantial likelihood of misidentification of Mr. Harty in this

matter.   Moreover, the reliability of the identification of Mr.

Harty cannot be supported by other evidence obtained in the

investigation.   There are no fingerprints on the gun.   The other

identifying witnesses were present when McAllister made his

identification.[4]   Cf.  United States v. Bell, 812 F.2d 188, 193

(5th Cir. 1987)(identification reliable when record provided

"ample" direct and circumstantial evidence).   Even assuming there

was other evidence of culpability, other evidence of Mr. Harty's

guilt "plays no part in [the] analysis" of reliability.

Brathwaite, 432 U.S. at 116.   Viewing the totality of the

circumstances through the five factor reliability prism, there

was a substantial likelihood of misidentification of Mr. Harty.

---

[4] Furthermore, any reliance placed on the alleged identifications
by Ms. Cortes and her son, Clemente Gonzalez, is misplaced.  First,
the Government failed to call either Cortes or Gonzalez at the hearing
so the court has no evidence regarding the exact circumstances
surrounding their alleged identifications.  Second, if the show-up
procedure employed here was unduly suggestive, the Government's
failure to call Cortes or Gonzalez should prohibit the court from
relying on their alleged identifications to bootstrap the reliability
of McAllister's identification.

Therefore, the show-up identification evidence must be excluded.[5]

    3.    Statements Made to Agent Rudnicki Must Be Suppressed
             Because they were Taken in Violation of Miranda.

Mr. Harty was arrested on the federal complaint on March 19,
2004.  During the course of his arrest Special Agent Lisa
Rudnicki advised Mr. Harty of his Miranda warnings.  TR 2: 26.
Agent Rudnicki described Mr. Harty as nervous, breathing heavily,
and visibly upset.  TR 2: 26, 29.  Agent Rudnicki testified that
Mr. Harty never waived his Miranda rights.  TR 2: 41 -42.  During
the course of transporting Mr. Harty to federal court, Agent
Rudnicki made comments to Mr. Harty regarding the origin of the
gun that he allegedly possessed.  TR 2: 33 - 35.  In direct
response to these comments, Mr. Harty allegedly stated that "he
got the gun off those kids I was in a fight with."  TR 2: 35.  In
addition, Agent Rudnicki also questioned Mr. Harty regarding his
criminal record, which is an element of the federal offense for
which Mr. Harty was charged.  TR 2: 39 - 42.

Statements made in response to custodial interrogation or

---

[5] Similarly, the photo-array identification by Gaines and any in
court identification by Gaines must be suppressed.  First, the array
itself was unduly suggestive in that of the nine individuals
presented, only two appear to have a full beard and mustache.  The
defendant is one of these two.  Of those two with a full beard and
mustache, only the defendant has hair that is not closely cropped.
Second, at the hearing, Gaines viewed the photo array and was unable
to identify the person he saw on January 20, 2004.  TR 2: 66.  Third,
Gaines could not recall a single detail of the events of January 20,
2004.  TR 2: 55-66.  Accordingly, Gaines is completely and utterly
unreliable and his prior identification of Mr. Harty should be
precluded.

its functional equivalent, absent a waiver of Miranda are inadmissible.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  Here, there is no doubt that Mr. Harty was in custody.  He was handcuffed and in a car with two Special Agents from the Bureau of Alcohol, Tobacco, and Firearms and being transported to federal court for his initial appearance.  On the issue of waiver, the Special Agents did not obtain an express oral or written waiver and failed to take any measures to ensure that Mr. Harty understood his rights.  Even more disturbing, is the fact that Special Agent Rudnicki routinely asks questions of her arrestees regarding their criminal history notwithstanding the fact that it is often an element of the crime charged.  TR 2: 40.  <u>See also</u> <u>United States v. Reylando Reyes</u>; Crim. No. 05-10113-DPW (defendant's statements suppressed because Agent Rudnicki's statements to defendant intended to elicit an incriminating response).

   Therefore, Mr. Harty's statements regarding where the gun came from and those concerning his criminal record should be suppressed.

                                LOREN HARTY
                                By his attorney,


                                /s/ Stylianus Sinnis
                                Stylianus Sinnis
                                B.B.O. #560148
                                Federal Defender Office
                                408 Atlantic Avenue, 3rd Floor
                                Boston, MA  02110
                                Tel: 617-223-8061

CERTIFICATE OF SERVICE

    I, Stylianus Sinnis, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 18, 2006.

                                        /s/Stylianus Sinnis
                                        Stylianus Sinnis