UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 04-10120-RGS

UNITED STATES OF AMERICA

v.

LOREN HARTY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTIONS TO SUPPRESS
AFTER EVIDENTIARY HEARINGS

March 7, 2007

STEARNS, D.J.

INTRODUCTION

Defendant Loren Harty was arrested by Boston police officers on January 20, 2004, and charged under state law with, among other crimes, the illegal possession of a firearm. Probable cause for Harty's arrest was based on identifications made by civilian witnesses during a street side showup. Upon being taken into custody, Harty's boots were seized as evidence. While the state charges were pending, Harty was indicted by a federal grand jury as a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). While being driven by agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) to the federal court in Boston for an initial appearance, Harty made incriminating statements. He now seeks to suppress the identifications, the boots, and the statements. For reasons that will be explained, the motions to suppress the identifications and the boots will be DENIED. The motion to suppress the statements will be ALLOWED.

FINDINGS OF FACT

After an extended evidentiary hearing and post-trial briefing, I make the following findings of fact.

1. Shortly after 4:00 p.m. on January 20, 2004, the Boston police received two 911 calls reporting gunshots at 42 Julian Street in Roxbury. The callers gave their names and addresses. One of the callers, Mariluz Cortez, resided at 38 Julian Street. Cortez described the gunman as a 5'3" to 5'4" black Hispanic male in his thirties, medium build, and wearing a black jacket, black jeans, and a black hat. Cortez stated that the gunman was headed in the direction of a liquor store on Blue Hill Avenue.

2. The 911 reports were broadcast by a police dispatcher. Officers converged on 42 Julian Street and quickly located three witnesses in a second floor apartment – Mark McCallister, the tenant, Damien Wiley, his cousin, and King Belin, a friend of Wiley's. Wiley stated that he had met Belin just before 4:00 p.m. on Blue Hill Avenue while walking to McCallister's apartment. The two men were accosted by a man whom they did not know. The man said to them, "You know me, I'm L. Got anything?" Wiley and Belin replied "no." They then asked "L" to leave them alone. In response, "L" challenged them to a fight. Wiley and Belin attempted to walk away, but "L" followed them to 42 Julian Street. After exchanging words with Wiley at the entrance to the building, "L" disappeared. Wiley and Belin proceeded to McCallister's apartment. Ten minutes later, the three men heard a ruckus on the street. From a window, they saw "L" waving his arms in their direction and shouting insults. McCallister left the apartment and confronted "L," demanding that he leave. "L" refused, insisting that McCallister, "Tell them niggers to

come down. I am going to pop them." "L" then drew a silver-colored handgun from the waistband of his pants. Upon seeing the gun, McCallister ran back into the building. As he fled up the stairs, he heard a gunshot. "L" chased McCallister into his apartment. He then began kicking at the door screaming, "I am going to get you motherfuckers."

      3. Eric Gaines, a hospital security guard who lived in the first floor apartment at 42 Julian Street, arrived home just before the scuffle between McCallister and "L" began. Gaines told a Suffolk County grand jury that he also had been accosted on Blue Hill Avenue by "L." In Gaines' opinion, "L" was drunk or high on drugs. Gaines told "L" that he did not know who he was. "L" nonetheless followed Gaines home. As they walked to 42 Julian Street, Gaines observed the handle of a gun protruding from beneath "L's" shirt. As Gaines fumbled for the key to his apartment, "L" became agitated and began yelling to the residents of the second floor apartment to "bring them niggers downstairs so I can pop them." McCallister then came out of the building and confronted "L". Gaines attempted to push McCallister back inside the vestibule. "L" followed them and drew the gun. As McCallister scrambled up the stairs, Gaines struggled to open the door to his apartment. Failing in the effort, he ran back towards the street, brushing by "L" as he did so. As he reached the door, he heard the report of a gunshot coming from the hallway.[1]

---

[1] Gaines was called by Harty as a witness on the final day of the hearings. Gaines' testimony differed markedly from his testimony before the Suffolk grand jury. While Gaines recalled the encounter with Harty on Blue Hill Avenue and the argument between Harty and McCallister in front of 42 Julian Street, he professed to remember little else. He denied having seen Harty with a gun and denied having heard a gunshot. When confronted with the substance of his grand jury testimony, Gaines stated that life was simply "too difficult" and that he no longer had a recollection of specific events. Having read the grand jury transcript and having heard the testimony of Gaines and other witnesses, I am persuaded that Gaines' present memory loss is, for whatever reason,

4. Officers Jon-Michael Harber and Edward Gately were among the officers in the area of Julian Street when the 911 calls were broadcast. They drove immediately to the liquor store on Blue Hill Avenue that they knew to be closest in proximity. When they arrived at the store some two or three minutes later, they saw Harty walking towards them. Gately noted that Harty bore a resemblance to the description of the gunman. Harty was then twenty-eight years old, black, had a medium build, and was wearing a black jacket and dark jeans.[2]

5. Harber recognized Harty from a prior arrest. He said to Gatley, "That's Loren Harty. Stop him." Harber knew that Harty had been previously arrested for felony offenses, including a firearms charge. As Harber and Gately got out of their cruiser, Harty threw his hands in the air insisting, "I didn't do anything." In Harber's opinion, Harty appeared uncharacteristically nervous. When Harber began a pat frisk, Harty exclaimed, "I don't have nothing. I don't have a gun."

6. After speaking with the officers at 42 Julian Street, Harber and Gately decided to have Harty taken to the scene of the shooting for purposes of a showup. Upon arriving at Julian Street, Harty was confined in a cruiser while Harber went to the second floor apartment to speak with McCallister, Belin, and Wiley. The three men told Harber that they would be able to identify the gunman. At Harber's radioed request, Harty was

---

feigned. Police found a bullet hole in the floor of the hallway in the area where Gaines told the grand jury the shot had been fired. Bullet fragments were also found in the cellar directly below the hole.

[2]On the other hand, Harty is 5'8" and not 5'4" tall, and was not wearing a hat. Although Harty wore a neatly trimmed beard and moustache, neither of the 911 callers had made mention of facial hair.

removed from the cruiser and positioned between Gately and at least one other uniformed officer. Wiley and McCallister made positive identifications of Harty from the vantage of the second floor window.[3]

7. When Harber radioed Gately that Harty had been positively identified by the men in the apartment, Gately placed Harty under arrest. Approximately seventeen minutes had elapsed from the time Harty had been stopped on Blue Hill Avenue.

8. While Harty was standing by the cruiser, Cortez shouted to the officers from her third floor window that Harty was the man she and her son had seen earlier with a gun. After completing the arrest, Gately spoke to Cortez. She stated that she had sent her twelve year old son out earlier to rent a video. He had come running back up the stairs screaming about a man with a gun. Cortez then went to the window. She observed Harty standing in front of 42 Julian Street waving a gray handgun and yelling for someone to come outside. After hearing a gunshot, Cortez returned to the window and saw Harty walk behind a building at 4 Rand Place towards the liquor store on Blue Hill Avenue. She then called 911.

9. Gately traced the route Cortez had seen Harty take. He followed a set of footprints in the snow to an open field at the intersection of Julian Street and Rand Place.[4]

---

[3] According to Harber and Gately, Belin also identified Harty, although Belin later told a federal grand jury that he had not gone to the window and had not made an identification.

[4] At the booking, Gately seized Harty's boots as evidence. He testified that the tread pattern of the soles of Harty's boots matched the distinctive tread impression left by the footprints he had followed in the snow. At Gately's request, photographs were taken of the footprints.

He found a silver-plated .357 magnum Ruger revolver hidden between two rocks and covered with a brick. The chamber of the revolver contained four live rounds of ammunition and one spent cartridge.

    10. While in state custody awaiting trial, Harty was indicted by a federal grand jury. On March 19, 2004, at the conclusion of a state court proceeding, he was taken into federal custody by ATF Special Agent Lisa Rudnicki. While en route to the federal courthouse in Boston, Rudnicki read the Miranda warnings to Harty from a wallet card. Harty indicated that he understood his rights. Rudnicki then told Harty that he had been indicted as a felon in possession of a firearm. Harty expressed disbelief that the "feds would take his case." Harty was nervous, visibly upset, and began hyperventilating. Rudnicki asked Harty if he had any information about the gun that ATF might find "useful." Harty stated that he had taken the gun "off some kids" with whom he had been fighting. Special Agent Phillip Ball, who was driving the car, interrupted and told Harty "do himself a favor" by talking first with his attorney. Rudnicki then told Harty that if he had anything else to say he should arrange an interview through his lawyer. Rudnicki then began asking Harty for "personal information." When Harty insisted to Rudnicki that his prior arrests were for minor alcohol-related offenses, she showed him a copy of his Board of Probation criminal record. She also told Harty that in her opinion he qualified as an armed career criminal.

## DISCUSSION

    A. <u>The Motions to Suppress Identifications</u>

Harty makes three interwoven arguments for suppressing the McCallister and Wiley identifications. First, he maintains that he was stopped and detained by Harber and Gately without reasonable suspicion. Second, he argues that his involuntary removal to 42 Julian Street converted the detention into a de facto arrest for which there was no probable cause. And third, he argues that this "unbroken chain of illegality" implicates the "fruit of the poisonous tree" doctrine of Wong Sun v. United States, 371 U.S. 471 (1963). In the alternative, Harty contends that the showup identification was impermissibly suggestive and therefore intrinsically unreliable.

    1. Reasonable Suspicion

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 145-146 (1972). See also Terry v. Ohio, 392 U.S. 1 (1968). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-418 (1981).

A combination of suggestive circumstances, largely innocent in and of themselves, when considered in their totality, may constitute the "reasonable suspicion" necessary to justify a Terry stop. United States v. Sokolow, 490 U.S. 1, 9 (1989). See United States v. Arvizu, 534 U.S. 266, 273-274 (2002) (conduct that might be perceived as innocent by

a casual onlooker may in the totality of the circumstances appear suspicious to a trained and experienced police officer).  Factors that among others weigh in the calculus of reasonable suspicion include: (1) a report of a recent and serious crime, United States v. Raino, 980 F.2d 1148, 1150 (8th Cir. 1992); (2) the proximity of a suspect to the scene of a reported crime, United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983); (3) visible apprehension and excessive nervousness at the approach of police, United States v. Atlas, 94 F.3d 447, 451 (8th Cir. 1996); (4) behavior indicative of a consciousness of guilt, Illinois v. Wardlow, 528 U.S. 119, 124 (2000); (5) an officer's knowledge of a suspect's reputation for criminal behavior, United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994); and (6) a suspect's resemblance to a description given by a witness to a crime, Commonwealth v. Barros, 425 Mass. 572, 584 (1997).

The encounter between Harber and Gately occurred within roughly three minutes of the 911 reports of shots being fired and not more than two minutes walking distance from the scene of the crime.  Upon the officers' approach, a very nervous Harty made a highly incriminating gesture – throwing his hands in the air while insisting, "I didn't do anything."  Harber knew that Harty had been previously arrested for serious crimes, including at least one firearms offense.  While the description of the gunman given by the callers did not match Harty in any distinctive detail, it was accurate in several important respects (age, complexion, build, and clothing) and the description matched no one else

in the immediate vicinity. In the totality of the circumstances, these facts were sufficient to warrant a reasonable suspicion on the officers' part that Harty was the gunman.[5]

### 2. The Forcible Return to the Crime Scene

While one-on-one confrontations are not favored, they do not violate due process if they are essential to an ongoing police investigation. See Simmons v. United States, 390 U.S. 377, 384-385 (1968). The determinative question is whether police had "good reason" to resort to a showup. "Good reasons include: the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track." Commonwealth v. Austin, 421 Mass. 357, 362 (1995). A person lawfully detained may be forcibly returned to the scene of a crime (or to a location where witnesses of a crime have gathered) for purposes of a showup. United States v. Charley, 396 F.3d 1074, 1080 & n.4 (9th Cir. 2005), citing 4 LaFave, Search & Seizure, § 9.2(g) (4th ed. 2004). See also United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006) (noting virtual unanimity among the Circuit Courts of Appeals on this issue). While there is an outward limit on the length of time a suspect can be detained without probable cause for an arrest, no bright line rule dictates what is reasonable in any given case. United States v. Sharpe, 470 U.S. 675, 686-687 (1985). Here but a handful of minutes elapsed between

---

[5] While Harber's statement to Gately – "That's Loren Harty. Stop him." – lends itself to the reasonable inference that Harber had decided to detain Harty prior to observing his the "hands in the air" gesture, Harber's subjective intent is irrelevant. See Whren v. United States, 517 U.S. 806, 812-813 (1996).

Harty's detention and the showup at 42 Julian Street. And once the identifications were made by McCallister, Wiley, and Cruz, police had probable cause for an arrest.

### 3. The Reliability of the Showup Identifications

In the alternative, Harty argues the identifications made by McCallister and Wiley should be suppressed as the unreliable artifacts of an impermissibly suggestive showup procedure. Suggestiveness that leads to "a very substantial likelihood of irreparable misidentification" is a violation of a defendant's right to due process. Neil v. Biggers, 409 U.S. 188, 198 (1972), quoting Simmons, 390 U.S. at 384. While "unnecessarily suggestive" confrontations are disfavored, they are not subject to a per se rule of exclusion. Rather, "reliability is the linchpin in determining the admissibility of identification testimony . . . ." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Under Biggers and Brathwaite, a defendant bears the initial burden of establishing by a preponderance of the evidence that an identification procedure was suggestive. If he successfully meets that burden, the government must then show by clear and convincing evidence that the identification was nonetheless reliable. See State v. Cefalo, 396 A.2d 233, 238-239 (Me. 1979). Reliability is a function of the following five factors: (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of any prior description; (4) the level of certainty of the witness; and (5) the time elapsed between the crime and the confrontation. Biggers, 409 U.S. at 199-200.

That elements of suggestiveness infected the showup in Harty's case is beyond doubt. The manner in which Harty was displayed beside the police cruiser braced

between two uniformed officers would have made it clear to any reasonable witness that the police were convinced that they had their man. But see Commonwealth v. Hicks, 17 Mass. App. Ct. 574, 583 (1984) ("The witness knows he would not be asked to make an identification unless the police had reason to suspect the detainee's involvement."). And while the testimony is conflicting, it would appear that McCallister and Wiley identified Harty while in one another's presence, a circumstance that, while not fatal, presents "obvious pitfalls." Commonwealth v. Marks, 12 Mass. App. Ct. 511, 515 (1981).

Assuming without deciding that Harty has met his burden of demonstrating that the showup procedure was impermissibly suggestive, I will turn to the reliability factors. These, to the extent relevant, without exception, weigh heavily against Harty. The first of the Biggers factors – a witness's opportunity to have observed the offender at the time of the crime is generally accorded the greatest weight. Allen v. Moore, 453 F.2d 970, 975 (1st Cir. 1972). Wiley had been approached by Harty on Blue Hill Avenue and followed to 42 Julian Street. Wiley exchanged words with Harty, both on Blue Hill Avenue and again in the front of 42 Julian Street. McCallister observed Harty from the apartment window and then confronted him on the street. After threatening to kill Wiley and Belin, Harty drew a gun and chased McCallister and Gaines into the building, firing a shot into the floor as McCallister ran up the stairs. These are events that tend to focus a witness's attention. The fourth and fifth of the Biggers factors also militate in favor of a finding of reliability. Neither Wiley nor McCallister hesitated in identifying Harty – both men reacted immediately when Harty was brought out of the cruiser. And the lapse of time between encounters was not more than seventeen minutes in McCallister's case nor more than

thirty minutes in Wiley's case.[6]  In sum, the identifications, even if the product of suggestion, were reliable.[7]

### 4. Suppression of the Gaines' Photographic Identification

Harty argues that the identification made by Gaines on March 8, 2004, from an array of nine photographs (an identification Gaines confirmed in his state grand jury testimony), should also be suppressed as unreliable.  He contends in the first instance that only he and one other individual in the array are depicted with full beards and moustaches and that only he is shown with hair that is not closely cropped.  The array was introduced at the suppression hearing and from the court's examination of the photos, Harty mischaracterizes the array.  Seven of the nine individuals shown have moustaches and at least three and possibly four have beards.[8]  All of the men have hair cut fairly short, and at least two are shown with hair longer than Harty's.  That some differences exist between a defendant's appearance and the appearance of others pictured in a photo array does not necessarily render the array impermissibly suggestive.  See United States v. Sanchez, 24 F.3d 1259, 1261 (10th Cir. 1994) (defendant was the only person pictured with his eyes closed); Commonwealth v. Napolitano, 378 Mass. 599, 602-603 (1979) (only three of forty-four photos depicted heavyset men with scraggly beards); Commonwealth v. Parker, 389

---

[6]The final reliability factor – the accuracy of a prior description – is not in play as neither McCallister nor Wiley was asked to provide a description of the gunman prior to the showup.

[7]Harty also objects in passing to the admission of any identification testimony by Cortez or her son. The grounds for suppressing their testimony, however, are not explained by Harty in his brief in any meaningful way and are therefore deemed waived.

[8]The photocopy of the array is slightly blurred.


Case 1:04-cr-10120-RGS Document 55 Filed 03/07/07 Page 13 of 19

Mass. 27, 31 n.3 (1983) (no other person pictured shared defendant's "precise kind of beard or shortness of hair.").

In the second instance, Harty argues that Gaines' identification is untrustworthy because at the evidentiary hearing Gaines professed to have no recollection of the reasons why he had selected Harty's photograph. He also testified that he no longer recognized Harty's photograph. A witness's prior statement of identification is not hearsay so long as the witness testifies at trial and is available for cross-examination. Fed. R. Evid. 801(d)(1)(C). Nor does the inability of a witness at trial (real or feigned) to recall the reasons for a prior identification implicate the Confrontation Clause. See United States v. Owens, 484 U.S. 554, 559 (1988) (the right of cross-examination "is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief . . . [thus,] we see no reason why it should not suffice when the witness' past belief is introduced and he is unable to recollect the reason for that past belief."). See also Delaware v. Fensterer, 474 U.S. 15, 21-22 (1985) (the opportunity to cross-examine an expert witness despite his inability to recall the exact basis of his opinion satisfies the requirements of the Confrontation Clause).[9]

B. <u>The Motion to Suppress Physical Evidence</u>

This motion can be disposed of summarily. It is premised on the assumption that Gatley did not have probable cause to arrest Harty and that the boots that he seized from

---

[9]I also note that even if Gaines were to be unavailable as a witness at trial, his testimony at the suppression hearing acknowledging his initials on the array indicating his selection of Harty's photograph would be admissible under Fed. R. Evid. 804(b)(1).

Harty are therefore a forbidden fruit under the Wong Sun doctrine.  As the court has ruled that there was probable cause, the seizure of Harty's boots was a lawful incident of his arrest.  United States v. Robinson, 414 U.S. 218, 234 (1973).  See also United States v. Edwards, 415 U.S. 800, 803-804 (1974) ("[S]earches and seizures that could be made on the spot at the time of arrest may be conducted later when the accused arrives at the place of detention.").

    C.   The Motion to Suppress the March 19, 2004 Statements

Harty seeks to suppress his statements to Special Agent Rudnicki on both Fifth and Sixth Amendment grounds. With respect to the Fifth Amendment, Harty argues that his statements were made in response to custodial interrogation without a knowing, intelligent, and voluntary waiver of his Miranda rights. The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself."  While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," United States v. Washington, 431 U.S. 181, 187 (1977), the Supreme Court in Miranda "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under these circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forego those rights."  New York v. Quarles, 467 U.S. 649, 654 (1984).

Miranda defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.  The Supreme Court has identified the ultimate test of custody as whether the person interrogated was subjected to a "formal

arrest or [a] restraint on [his or her] freedom of movement of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994); see also Yarborough v. Alvarado, 541 U.S. 652, 667-669 (2004).

At the outset, it is worth identifying what is not at issue. There is no material dispute that: (1) Harty received and understood the Miranda warnings; (2) the questioning by Agent Rudnicki was custodial; (3) Harty never expressly waived his Miranda rights; and (4) Harty's statements were voluntary in the sense of not being the product of an overborne will.[10]

A statement may, however, be voluntary and yet not be the product of a knowing and intelligent waiver of a constitutional right. Edwards v. Arizona, 451 U.S. 477, 483-484 (1981). The test for determining whether a suspect has effectively waived his rights under Miranda is stated by the Supreme Court as follows: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the

---

[10]Harty was not subject to any of the interrogation methods or tactics that typically render a statement involuntary. There is no suggestion that Harty was subjected to physical duress, Brown v. Mississippi, 297 U.S. 278 (1936), unrelenting questioning, Davis v. North Carolina, 384 U.S. 737 (1966), threats, Lynumn v. Illinois, 372 U.S. 528 (1963), cajolery, Spano v. New York, 360 U.S. 315 (1959), promises of leniency, Griffin v. Strong, 983 F.2d 1540 (10th Cir. 1993), or trickery, Miller v. Fenton, 474 U.S. 104 (1985).

15

consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

If a defendant is accurately informed of his Miranda rights, an express waiver of rights is not always necessary. "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). Nonetheless, a waiver will not be lightly inferred. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests with the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. . . . [A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." Miranda, 384 U.S. at 475.

While the question is reasonably close, I conclude that the government has failed to meet its "heavy" burden of showing a voluntary and knowing waiver. Agent Rudnicki testified that when Harty was told that he faced federal prosecution, he became upset and began hyperventilating. According to Rudnicki, she made no effort to secure a waiver from Harty because she did not believe that her questions and comments constituted interrogation. This is simply not tenable. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response . . . ." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Although the test is an objective one, where police act with the purpose of eliciting an incriminating statement, an officer's subjective intent is relevant to the issue of whether she

knew that her conduct was reasonably likely to provoke an incriminating response. Id. at 301-302 n.7. It is difficult to believe that Rudnicki's "explanation" of the gravity of the federal charge, her invitation to Harty to provide ATF with "useful" information about the gun, her pointed rebuttal of Harty's claim that he did not have a serious criminal record, and her proffered opinion that Harty qualified for armed career criminal status, could be interpreted objectively as anything but conduct intended to elicit incriminating responses. The Fifth Amendment therefore compels the suppression of Harty's statements.

For the sake of completeness, I will also address Harty's claim that his Sixth Amendment right to counsel was also violated. A right to counsel arises under both the Fifth and Sixth Amendments. However, the "policies underlying the two constitutional protections are quite distinct." Innis, 446 U.S. at 300 n.4. The Fifth Amendment right is intended to insure the integrity and fairness of police interrogation. Fare v. Michael C., 442 U.S. 707, 719 (1979). The Sixth Amendment right is intended to protect the attorney-client relationship and the right of an accused to rely on counsel as a medium between himself and the State. See Patterson v. Illinois, 487 U.S. 285, 296 n.9 (1988). The Fifth Amendment right attaches during custodial interrogation. The Sixth Amendment right, on the other hand, attaches only "at or after the initiation of adversary judicial criminal proceedings." Kirby v. Illinois, 406 U.S. 682, 689 (1972).

The guarantees of the Sixth Amendment, like those of the Fifth, are not self-executing. McNeil v. Wisconsin, 501 U.S. 171, 178-179 (1991). As a rule, an accused must affirmatively request the assistance of counsel to avail himself of the Sixth Amendment right. Patterson, 487 U.S. at 290-291. The rule, however, is different where

17

an accused is represented by appointed or retained counsel. "Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." Id. at 290 n.3.[11]  Thus, a statement elicited by police from an indicted defendant in the absence of counsel is presumptively invalid.[12] Jackson, 475 U.S. at 636. As with the Fifth Amendment, a represented suspect charged with a crime may voluntarily choose to speak with police without his attorney being present. Michigan v. Harvey, 494 U.S. 344, 352 (1990). But the same standard that governs waiver of the Fifth Amendment right to counsel also governs waiver of the Sixth Amendment right. A waiver must be both voluntary and an informed and intelligent relinquishment of a known right or privilege. Brewer v. Williams, 430 U.S. 387, 404 (1977).

---

[11]For present purposes, I assume – as did agents Rudnicki and Ball – that counsel representing Harty on the state firearms charge also represented him on the federal charge. (The government has offered no evidence to suggest otherwise). Ironically, but for the fact of the federal indictment, Harty would have been entitled to no Sixth Amendment protection at all. The Sixth Amendment right to counsel is "offense specific." McNeil, 501 U.S. at 175. Thus, there is no Sixth Amendment prohibition against police-initiated interrogation of an indicted suspect about an unrelated, uncharged offense, unless the uncharged crime falls under the "same elements" test of Blockburger v. United States, 284 U.S. 299, 304 (1932). See Texas v. Cobb, 532 U.S. 162, 173 (2001). Whether Cobb incorporates the entire corpus of the Supreme Court's double jeopardy jurisprudence or only the Blockburger test has led to a split in authority over whether under the "dual sovereignty doctrine" conduct that violates identical state and federal statutes constitutes the same or distinct offenses. The First Circuit has embraced the expansive view of Cobb. See United States v. Coker, 433 F.3d 39, 44 (1st Cir. 2005). Compare United States v. Mills, 412 F.3d 325, 330 (2d Cir. 2005).

[12]The Sixth Amendment "deliberate-elicitation" standard is distinguishable from the Fifth Amendment "custodial-interrogation" standard and applies even where police conduct does not amount to formal interrogation. See Fellers v. United States, 540 U.S. 519, 524 (2004) (querying whether the term "interrogation" has any relevance at all in a Sixth Amendment context).

The reasons that compel the suppression of Harty's statements on Fifth Amendment grounds also require their suppression under the Sixth Amendment.

## ORDER

For the foregoing reasons, the motion to suppress the identifications made by McCallister, Wiley, and Gaines, is <u>DENIED</u>.  The motion to suppress the boots seized at Harty's booking is <u>DENIED</u>.  The motion to suppress Harty's statements to the ATF agents is <u>ALLOWED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE